**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 4, 2026

*Stephen, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 4, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 103824-1 |
| Respondent, | EN BANC |
| v. | Filed: June 4, 2026 |
| NIGEL SINCLAIR HOGAN SR., | |
| Petitioner. | |

GORDON McCLOUD, J.—For many years, it has been clear that federal law fails to protect against race discrimination in jury selection.[1] So in 2018, this court took our own step toward tackling that problem: we adopted GR 37. It contains specific rules, procedures, and presumptions designed to eliminate the historical pattern of race discrimination against people of color in jury selection.

Importantly, that rule takes a race-neutral approach to protecting the constitutional rights of the defendant to a fair trial and of the prospective juror to be

---

[1] *See, e.g.*, *State v. Bell*, 5 Wn.3d 54, 63-64, 571 P.3d 272 (2025); *State v. Pierce*, 195 Wn.2d 230, 239, 455 P.3d 647 (2020) (plurality opinion); *State v. Saintcalle*, 178 Wn.2d 34, 46-49, 309 P.3d 326 (2013) (plurality opinion), *abrogated in part on other grounds*, *City of Seattle v. Erickson*, 188 Wn.2d 721, 398 P.3d 1124 (2017).

considered for jury service without bias based on race or ethnicity.[2] The rule recognizes that a court is never justified in relying on a potential juror's race or ethnicity as a basis to remove them from the jury.

In this case, a jury convicted Nigel Hogan of second degree felony murder. Clerk's Papers (CP) at 160-62. Hogan is Black. During the jury selection process (voir dire), the State used a peremptory challenge—a challenge for which no reason need be given—to dismiss juror 40. Juror 40 is white. The main question on appeal is whether the State's peremptory challenge violated GR 37's bar on race discrimination in jury selection. The defense argues that the challenge violates GR 37 because it was based on juror 40's acknowledgment of the history of race and ethnic bias in policing and prosecution and, hence, that the peremptory challenge impermissibly implicated the defendant's (Black) race. The State responds that GR 37 targets bias against potential jurors based on the juror's race, not bias against potential jurors' viewpoints based on the defendant's race.

We agree with the State. GR 37's language, context, and history show that it targets dismissal of potential jurors based on the juror's race or ethnicity (whatever that race or ethnicity might be). GR 37 does so by mandating that if "an objective observer could view race or ethnicity as a factor in the use of the peremptory

---

[2] *Bell*, 5 Wn.3d at 57 (citing *Batson v. Kentucky*, 476 U.S. 79, 85-86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)).

challenge, then the peremptory challenge shall be denied. The court need not find purposeful discrimination to deny the peremptory challenge." GR 37(e). GR 37 also does so by barring the challenging party from relying on certain supposed "reasons for peremptory challenges [that] have been associated with improper discrimination in jury selection in Washington State" in the past. GR 37(h). And GR 37 does so by barring the challenging party from relying on vague and unverified allegations about prospective jurors' demeanor; instead, GR 37 requires the challenging party to provide the court and the parties with notice and an opportunity to observe the challenged demeanor themselves, first. GR 37(i).

Applying those rules to this case, we conclude:

1. A party who objects to a peremptory strike on the basis of GR 37 can preserve that objection for review by simply stating, "GR 37."

2. In this case, defense counsel stated "GR 37" but made clear that the objection was based solely on gender identity discrimination, not race/ethnicity discrimination. This undermined the citation to GR 37, invited the trial court to address only a non-GR 37 issue, and, hence, failed to preserve the otherwise proper GR 37 objection for review.

3. Our prior decisions, however, hold that we have the discretion to reach claims of race discrimination for the first time on appeal. We do so here.

4. On the substantive issue presented, the State failed to follow GR 37(i)'s procedures for verifying its claims about juror 40's supposed demeanor. GR 37(i) therefore bars the trial court, and this court, from crediting the State's demeanor-based justifications for its peremptory challenge.

5. The State justified its peremptory challenge to juror 40 with a reason that is presumed invalid because it is associated with historical bias against people of color. But that presumption is rebuttable, and we must evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances.

6. Considering the totality of the circumstances, including the full pattern of jury questioning and the State's permissible justifications for its peremptory challenge, an objective observer could not view race as a factor in the State's peremptory challenge to juror 40.

FACTUAL AND PROCEDURAL HISTORY

I.     Overview

The State charged Hogan with second degree murder and first degree assault in October 2015. CP at 1-2. The jury convicted him only of second-degree felony murder. *Id.* at 160-62.

This appeal concerns the composition of that jury. The State used a peremptory challenge to strike prospective juror 40 during jury selection. Juror 40

was white and selected "prefer not to answer" for their gender but otherwise did not discuss or disclose their gender identity. Although gender identity is not a protected classification under GR 37, defense counsel objected to the State's peremptory challenge to juror 40 by stating, "GR 37," and then continuing (without record support and outside the presence of the jury) that juror 40 "is one of the only trans persons on the jury. In the entire panel."[3] 6 Verbatim Rep. of Proc. (VRP) (June 1, 2022) at 925. The trial court then addressed a challenge based on defense counsel's (not the potential juror's) assertions about juror 40's gender identity. It was not presented with, and did not consider, a challenge based on race discrimination. The trial court overruled the objection and permitted the challenge.

On appeal, Hogan argues that the peremptory challenge to juror 40 violated GR 37's bar on race discrimination.[4] As discussed above, he explains that one of the State's proffered justifications for its peremptory challenge (juror 40's "'significant concerns about [race discrimination in] the criminal justice system'") cannot be

---

[3] All potential jurors received a questionnaire that included the question, "What is your gender?" Corrected Ex. 104 at cell L1. From the available options (male, female, nonbinary, or prefer not to answer), juror 40 selected "[p]refer not to answer." *Id*. at cell L33. That is the only evidence in the record on the juror's gender identity. This evidence shows that juror 40 indicated that they wanted to retain privacy in that information about their gender identity. Juror 40 was not alone in this; several other jurors made the same "[p]refer not to answer" selection for their gender identity. *Id.* at cells L4, L19.

[4] Hogan raised other claims, including the claim about discrimination on the basis of gender identity, but we did not grant review on that issue. Pet. for Rev. at 27-28.

considered because it is presumptively invalid under GR 37(h)(ii). Pet. for Rev. at 9 (quoting 6 VRP (June 1, 2022) at 926). He further explains that the State's and the court's descriptions of the juror's demeanor and conduct ("'seem[ing] very uncomfortable'" and struggling to articulate their thoughts) cannot be considered because the State and the trial court failed to comply with GR 37(i)'s procedures. *Id.* (quoting 6 VRP (June 1, 2022) at 926). He concludes that these proffered justifications could lead an objective observer to conclude that the State's peremptory challenge to this white juror violated GR 37.

This case therefore requires us to decide (1) what are the threshold requirements for preserving a GR 37 objection for appellate review, (2) how should courts apply GR 37(h) and (i)'s limits on consideration of certain justifications for a peremptory challenge in a case where the challenged juror is white, and (3) considering the proper reasons, and not the barred reasons, could an objective observer conclude that race was a factor in the State's peremptory strike of this juror.

II.    Juror 40's Questionnaire and Verbal Responses

GR 37(e) requires us to answer that final question by considering the "totality of circumstances." Those circumstances include but are not limited to

> (i)    the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

(ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

(iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;

(iv) whether a reason might be disproportionately associated with a race or ethnicity; and

(v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

GR 37(g).

So before examining the peremptory strike against juror 40, we summarize the questions posed to and responses provided by juror 40 and other potential jurors.

We begin in this section with the challenged juror's—juror 40's—questions and responses. In the next section, we turn to other jurors' related questions and responses.

On the pre-voir-dire written questionnaire, juror 40 selected "Caucasian" to describe their race and "[p]refer not to answer" in response to a question about their gender.[5] Corrected Ex. 104 at cells K33, L33. They also made the following statements in their questionnaire. In response to a question asking, "Do you have strong opinions about law enforcement or the criminal justice system such that it

---

[5] The options were male, female, nonbinary, or prefer not to answer.

would be difficult for you to be a fair and impartial juror in this case? (If yes, please explain.)," juror 40 wrote:

> Yes. I have strong beliefs about when the police use excessive force on arrestees, protesters, and historically underrepresented groups of people. I especially don't like how law enforcement is given the most funding from the city than any other department that is, let's say, more impactful to peoples [sic] lives. I also think the criminal justice system is too harsh, especially against, again, historically underrepresented groups of people, and it is overwhelmingly harsh on poor people.

*Id.* at cell AD33.

The questionnaire continued, "Do you agree or disagree with the following statement: We sometimes make judgments and have preconceptions about other people based on their race or ethnic background." The next question invited (but did not require) jurors to explain their answer. *Id.* at cells AO1, AP1. Juror 40 agreed with the statement and offered this explanation:

> People, depending on how you grew up, can develop racial biases towards people of color and people with different ethnic backgrounds. This happens because racial biases are deeply rooted in our country and it's [sic] history. The cause of this can be from media, family, friends, lack of knowledge on the subject matter, etc. This sort of racial bias can be seen through political ideology, beliefs, and how an individual acts towards someone.

*Id.* at cell AP33.

The questionnaire also gave jurors the option to request individual questioning on matters they would prefer to discuss without the full jury panel present. *Id.* at cell

AQ1. Juror 40 took that offer and asked to be questioned individually about their political beliefs during voir dire. *Id.* at cell AR33.

The State repeatedly raised the issue of race during voir dire. 5 VRP (May 31, 2022) at 743-44, 745, 747, 748, 830-31, 832, 834, 841 (asking potential jurors how they feel about being part of a case involving a person of color or how they would feel telling their friends and family that they found a person of color guilty). The State also asked jurors about the questionnaire's query about whether they agreed or disagreed that we sometimes make judgments and have preconceptions about other people. *Id.* at 771. The State asked jurors why they thought the court asked that question. The State prompted jurors 5, 10, 14, and 46 for their thoughts. *Id.* at 771-74.

Then the State asked if juror 40 had any comments. *Id.* at 774. Juror 40 seemed to agree with sentiments shared by the four jurors who previously responded to that question ("I think it would be just the same"), and added:

> [B]ut I believe they asked this question just because—if we do make decisions based on our own understanding and implicit bias can affect how decisions are made, especially in court. So I think you wanted to ask this question because of people understanding that implicit bias is a thing[,] so they can refrain from applying implicit bias to make decisions from [it].

*Id.* at 774-75. This is the only question juror 40 answered in front of the full panel.

Juror 40 was questioned individually (at their request) after the rest of the panel was excused. *Id.* at 801-03. The court asked juror 40 whether, after sitting

9

through jury selection, was there "anything that makes you concerned about your ability to be a fair and impartial juror in this case?" Juror 40 responded, "Um . . . that depends. I'll need to be asked the questions again." *Id.* at 801.

The State asked juror 40 to explain their opinions about law enforcement noted on their questionnaire. Juror 40 responded:

> [T]here has been a history of law enforcement and the criminal justice system being unfair and unlawful to historically underrepresented and disenfranchised groups of people. And even though I believe that the justice system can be effective when done—when done correctly, I think [it is] that [it is] more so done inadequately.

*Id.* at 802.

The State continued by asking juror 40 if they would "simply assume that the investigation by the police department was done incorrectly" or whether they would go into the case with an open mind. *Id.* Juror 40 responded, "I will go into this case with an open mind and see what has been said." *Id.* When asked if they had a bias against the police or the State that would be hard to set aside, juror 40 responded, "You know, I find problems with the system as a whole. Since we are talking about an individual, I'll look into the evidence when presented to them. So I will have an open mind about this case." *Id.* at 803.

The court cut off possible follow-up due to time constraints. *Id.* The defense then asked about juror 40's views on self-defense and Washington's "Stand Your Ground" law. *Id.* at 803-04. Juror 40 answered, "I believe that people have the right

to defend themselves, especially in a situation they find themselves to be in danger. But with clearer—(indecipherable)—can you tell me more about it?" Defense counsel elaborated on the Stand Your Ground law, but the court ended questioning before juror 40 could respond. *Id.* at 804.

III.    Responses of Other Seated and Stricken Jurors

We now summarize the frequency and content of related questions and answers from other seated and stricken jurors in this case.

Jurors 7, 25, and 66 also indicated on their questionnaires that they had strong opinions about law enforcement or the criminal justice system. These jurors were all seated on the jury. Jurors 33 and 34 provided similar opinions. The State used peremptory challenges against those two. All of these jurors' statements are summarized below.

A. *Juror 7*

Juror 7, who in his questionnaire identified as "[s]ome other race, ethnicity, or origin," wrote:

> I think that the criminal justice system has severe flaws. I think the system perpetuates oppression of certain groups of people but I don't think the system is completely broken. The system is deeply flawed but it's better than no system. Sadly I don't think there is any meaningful change coming soon that would make the system fairer for those that have been historically oppressed by it but I also don't spend my time reading up on what folks are doing to change the system so I could definitely be wrong due to lack of information.

Corrected Ex. 104 at cells K8, AD8.

When asked about this response during voir dire, juror 7 stated, "I think that historically the criminal justice system has been biased towards certain minority group[s] of people." 5 VRP (May 31, 2022) at 735. He spoke about his experience on a civil jury, and when asked whether his "concerns about the historical racism within the criminal justice system" would make sitting on a criminal jury different, he said, "I don't think that my sense of historical biases means that I don't find value in—in the system." *Id.* at 736. Juror 7 was seated on the jury.

### B. Juror 25

Juror 25, who selected "[p]refer not to answer" for his race, wrote, "Yes [I have strong opinions about law enforcement or the criminal justice system such that it would be difficult to be fair and impartial]—my brother served prison time for a crime he did not commit." Corrected Ex. 104 at cells K19, AD19.

When the State asked juror 25 about his questionnaire response, he explained that his brother pleaded guilty to a charge even though "there was not much evidence available other than claims from the other party." 5 VRP (May 31, 2022) at 737. Juror 25 said he would not want to put someone else through that and that it would be difficult to be fair and impartial. *Id.* at 738. The State asked if he thought he should be a juror on this case, and he responded, "Honestly, no, ma'am." *Id.* at 739. In response to questioning by the defense, he said it would be difficult "but certainly possible" to be fair, and he would try his best to base his decision solely on the

evidence and the court's instructions. *Id.* at 740. The court denied the State's motion to excuse juror 25 for cause, and juror 25 was seated on the jury. *Id.* at 740-41.

### C. Juror 66

Juror 66, who identified as Asian, wrote, "No [I don't have strong opinions about law enforcement or the criminal justice system such that it would be difficult to be fair and impartial], but I do think there is a fundamental bias towards class and race built into the foundation of both law enforcement and the criminal justice system. I don't know anything about this case, however." Corrected Ex. 104 at cell AD55.

Persistent technical difficulties prevented juror 66 from speaking during voir dire, so juror 66 was questioned individually by telephone (rather than by Zoom, like the rest of the panel). 5 VRP (May 31, 2022) at 904-11. But juror 66 was not asked about this response on her questionnaire. Juror 66 was seated on the jury.

### D. Juror 33

Juror 33, who identified as "Caucasian" on her questionnaire, wrote:

> Yes [I have strong opinions about law enforcement or the criminal justice system such that it would be difficult to be fair and impartial], I think that our law enforcement and criminal justice system is unjustly biased towards people of color and black men in particular. I believe in our criminal justice system when it is working well, however, too often people, especially people of color, are unjustly prosecuted.

Corrected Ex. 104 at cells K27, AD27.

13

When the State asked juror 33 to explain her questionnaire response, she said, "I don't particularly trust our police department . . . . I believe in the justice system, but I think that . . . there's a lot . . . to be improved with our police department . . . ." 5 VRP (May 31, 2022) at 742. Juror 33 also stated that "it would be difficult" if she had to hear testimony from Seattle Police Department and that "I think I would be skeptical" of such testimony. *Id*. But she also stated that she "certainly would do [her] best to be impartial" and "would pay particular attention to the Judge's orders on . . . what exactly are each of the points that need to be proven." *Id.* at 743, 745. When asked how she would feel convicting a person of color, she said, "You know, I don't think that just because our system is biased that people don't commit crimes." *Id.* at 745. The State used its first peremptory challenge to dismiss juror 33, without objection.

### E. Juror 34

Juror 34, who chose "Caucasian" on his questionnaire, wrote, "I believe in & support the movement to re-allocate significant funding from police and as part of the effort to re-invest in community-lead [sic] organizations and programs as they relate to crime prevention and mental health crisis response." Corrected Ex. 104 at cell AD28.

When the State asked juror 34 about his questionnaire response, he said:

I believe that I wrote about, um, how I recognized that there was a lot of bias . . . within our law enforcement community, particularly the

> Seattle Police Department, with racial issues with targeting minorities and higher arrest rates and prosecution rates.
>
> . . . I also recognize that the Court has been historically unfavorable and bias [sic] against people of color and minority groups. And so being . . . a potential member of the jury, I understand that it's my job to try and mitigate that bias as much as possible.

5 VRP (May 31, 2022) at 746.

When asked how he would feel "about finding the defendant guilty and then telling your friends and family that you found this—a person of color guilty, even on a Seattle Police Department case," juror 34 responded, "I don't have any doubt in myself that I could—I could find someone guilty of that . . . if that was what I had—believed that I was shown through the evidence and throughout the court proceedings." *Id.* at 748. The State used its second peremptory challenge to strike juror 34, without objection.

### F. Summary of Types and Frequency of Juror Questions

In sum, the State posed the same types and frequency of questions on race and policing to many jurors, not just juror 40. And of the jurors expressing views similar to the views given by juror 40—that is, acknowledging the history of racial bias in policing and prosecution—the State successfully challenged two, without objection, and the State allowed the rest to serve. Jurors of color were certainly not struck for this or any other ground at a higher rate than jurors who identified as "Caucasian."

IV.    Defense Counsel's GR 37 Objection to Juror 40's Removal

The day after voir dire questioning, outside the presence of the panel, the court invited each party to exercise its peremptory challenges. 6 VRP (June 1, 2022) at 922-23. As mentioned above, the State used its first two challenges against jurors 33 and 34, both white potential jurors who acknowledged the history of racial bias in policing and prosecution in the city of Seattle. There were no objections. But the State did not use any peremptory challenges against the other jurors, discussed above, at least some of whom were jurors of color, who also acknowledged that history of racial bias in policing and/or prosecution.

The State also challenged juror 40. Defense counsel objected, stating, "And defense would like to raise a GR 37 argument to that. This individual is one of the only trans persons on the jury. In the entire panel." *Id.* at 924-25. To reiterate, there is no evidence in the record about juror 40's gender identity. In fact, juror 40 specifically answered the question about gender with "[p]refer not to answer," indicating they wished to retain privacy in that information.[6]

---

[6] It is necessary to discuss important and sensitive issues in jury selection when they are relevant. And counsel might want to raise concerns about gender identity or discrimination on the basis of gender identity when it is relevant. But any such discussion must be respectful and limited to what is necessary for determining the juror's qualifications to sit on the jury. *See* NAT'L LGBTQ+ BAR ASS'N & FOUND., LGBTQ+ INCLUSION FROM THE BENCH: A BEST PRACTICES GUIDE FOR JUDGES 22 (June 2025), https://lgbtqbar.org/wp-content/uploads/sites/6/sites/8/2025/06/LGBTQ-Bench-Guide-FINAL-June-2025-v1.pdf [https://perma.cc/X99H-K84X].

The court pulled up juror 40's questionnaire and requested a response from the State. *Id.* at 925. The State responded:

> I think counsel is making some assumptions. They are both based on probably appearance and "prefer not to answer" that this person is transgender. I don't think you can possibly say that you know if anyone else on this panel is or is not transgender. They might identify their gender specifically. They might decline to identify. And I don't think you can just go on appearances alone.
>
> Second of all, this juror was uncomfortable talking about their very significant political views in the group. And when we spoke with them privately, they struggled to sort of articulate their thoughts. They seemed very uncomfortable. This did not seem like someone from the State's perspective that was going to be able to—in a—in a jury room take a position and stand up for it and communicate with other jurors.
>
> They expressed significant concerns about the criminal justice system, which, of course, lots of people did, but it was hard to really get to the core of it.
>
> And so we do not think that defense—that there is any possibility that an objective person would believe that the State struck this person based on an outside possibility that they were transgender.

---

Assuming juror 40's gender identity—despite the lack of information about their gender identity in the record, despite their expressed preference to keep their gender identity private, and despite the irrelevance of their gender identity to GR 37 or to their fitness to serve as a juror in this case—is not respectful and limited to what is necessary for determining the juror's qualifications to sit on the jury. It could undermine respect for the principles of autonomy and dignity that undergird our legal and constitutional framework. *See Obergefell v. Hodges*, 576 U.S. 644, 681, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015) (the constitution grants individuals equal dignity in the eyes of the law); *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (protecting personal relationships and autonomy from State intrusion). In today's context, where transgender individuals face heightened vulnerability from many holding positions of power, even an inadvertent assumption can have consequences that implicate safety and dignity—values our legal system is meant to protect.

*Id.* at 925-26.

The court stated that it remembered questioning juror 40 individually and took a moment to review their questionnaire. *Id.* at 926. The transcript notes that there was a sotto voce (hushed tones) discussion. *Id.* The court then denied the motion:

> All right. So the motion is denied. I don't think there is a basis for arguing that this person is being challenged because they're transgender.
>
> Primarily, they have not identified as transgender. It was not apparent to me that they were transgender, it's not on the questionnaire that their [sic] transgender, and, um—and in addition, there is a basis for challenging them that is—that is not based on—on their identity and that is their answers on the questionnaire which indicated that they have strong beliefs about when police use excessive use of force on arrestees, the protesters and historically onto represented [sic[7]] groups.
>
> And also, they were very reticent when answering questions during voir dire. They—they seemed to have a very difficult time, uh, responding to questions. And so, um, the motion is denied and Juror 40 is struck.

*Id.* at 926-27.

V.      Hogan's Appeal

On appeal, Hogan argued (among other issues) that the trial court erred in denying this GR 37 challenge. The Court of Appeals affirmed. *State v. Hogan*, 33 Wn. App. 2d 209, 211, 559 P.3d 1033 (2024). The Court of Appeals held that

---

[7] Juror 40 noted concern with the way that historically *under*represented groups have been treated by law enforcement and the justice system, so this is likely a mistranscription.

18

because defense counsel had asserted a facially improper basis for the GR 37 objection (i.e., gender identity), the trial court properly denied that objection and the defense failed to preserve a GR 37 argument about racial bias for review.

Prior to oral argument at the Court of Appeals, Hogan submitted a statement of additional authorities (SAA) pursuant to RAP 10.8. The Court of Appeals granted the State's motion to strike the SAA because it did not cite any authority that was newly decided after briefing was completed. Hogan argues that the Court of Appeals erred because RAP 10.8 contains no such limitation.

We accepted review of the race-based GR 37 issue and the SAA issue.[8] 4 Wn.3d 1026 (2025).

ANALYSIS

I.      Standard of Review

Hogan's petition for review asks "[w]hether an appellate court's review of a claimed violation of GR 37 is de novo, or does the appellate court apply a lesser standard that defers to factual findings by the trial court?" Pet. for Rev. at 2.

We recently addressed this question in *State v. Bell*, 5 Wn.3d 54, 571 P.3d 272 (2025). We held that we review GR 37 decisions de novo. *Id.* at 58. We further

---

[8] The Washington Association of Criminal Defense Lawyers, American Civil Liberties Union (ACLU) of Washington Foundation, Center for Civil Rights and Critical Justice, and Washington Defender Association filed a joint amici brief in support of petitioner. Appellate law firm Talmadge/Fitzpatrick filed an amicus brief arguing for reversal of the Court of Appeals' decision on the SAA issue.

explained that the trial court's subjective impressions about juror demeanor get no special deference. *Id.* at 65. *Bell* makes clear that de novo review applies "in order to prevent reverting back to the pre-GR 37 case resolution where reversal based on *Batson*[9] challenges were rare or nonexistent." *Id.* at 66.

We hew to *Bell* to hold that the trial court's subjective impressions about the juror's demeanor are part of the record on review, not findings entitled to special deference.

Specifically, the State's and trial court's observations that juror 40 was "very reticent when answering questions during voir dire," "seemed to have a very difficult time . . . responding to questions," and appeared uncomfortable are subjective impressions about juror demeanor subject to GR 37(i)'s corroboration requirement.

GR 37(i) states:

> The following reasons for peremptory challenges also have historically been associated with improper discrimination in jury selection in Washington State: allegations that the prospective juror was sleeping, inattentive, or staring or failing to make eye contact; exhibited a problematic attitude, body language, or demeanor; or provided unintelligent or confused answers.

The State's justifications that juror 40 struggled to articulate their thoughts and *seemed* uncomfortable are just the sort of "demeanor," "body language," and

---

[9] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

supposedly "unintelligent or confused answers" that GR 37(i) treats as "[c]onduct" subject to its strict verification procedures.

To comply with those GR 37(i) procedures, the party who intends to offer a demeanor-based justification "must provide reasonable notice to the court and the other parties so the behavior can be verified and addressed in a timely manner. A lack of corroboration by the judge or opposing counsel verifying the behavior shall invalidate the given reason for the peremptory challenge." As we explained in *Bell*, "to corroborate the alleged [behavior], both judge and opposing counsel would need to agree on additional evidence [as corroboration], although not necessarily the conclusion from that evidence . . . ." 5 Wn.3d at 70.

There was no such notice, additional evidence, or corroboration in this case. And the transcript does not support the trial court's conclusion that juror 40 was inarticulate or reticent, either. Juror 40 answered every question posed to them. Juror 40's answers seem as cogent as the answers of the other lay jurors quoted above. Their comments demonstrated understanding and thoughtfulness, sometimes asking follow-up questions to make sure they were providing a precise answer. *See, e.g.*, 5 VRP (May 31, 2022) at 803-04.

The State and the trial court failed to comply with GR 37(i)'s fact-finding procedures. Thus, we decline to credit the State's proffered justification that juror 40 "struggled to . . . articulate their thoughts" and "seemed very uncomfortable" or

the trial court's statements that juror 40 was "reticent" and having a difficult time answering.

We next address whether the GR 37 claim was properly preserved for review and, if not, whether we are permitted to review it for the first time on appeal.

II. This Court May Review the GR 37 Racial Bias Claim Even Though the Parties and Trial Court Did Not Raise That Claim in the Trial Court

A. *Hogan Cited GR 37 but Raised an Argument About Something Totally Different Than GR 37; This Fails To Preserve the GR 37 Issue for Appeal*

As discussed above, when the State exercised a strike against juror 40, defense counsel immediately objected by stating, "GR 37," and continuing that juror 40 "is one of the only trans persons on the jury. In the entire panel." 6 VRP (June 1, 2022) at 925. Defense counsel, the State, and the court then all focused on juror 40's gender identity when discussing the GR 37 objection.

But GR 37 does not address gender identity. GR 37 addresses race and ethnicity discrimination.

The State therefore argues that Hogan made an "invalid objection" (based on gender identity discrimination) that was insufficient to "preserve claims on other, unstated grounds" (race discrimination). State's Suppl. Br. at 11-12. The Court of Appeals agreed. *Hogan*, 33 Wn. App. 2d at 218-20.

The State has a strong argument. Parties must raise timely objections at trial to give the trial court a chance to correct errors as they happen. Failing to do so generally prevents a party from raising that claim of error on appeal. *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). The objection below did not give the trial court that chance.

### B. *GR 37, However, Has Its Own Rule for Preservation of Error*

But GR 37 has its own rule for preservation of error. So to determine whether Hogan preserved a real GR 37 issue for review, we turn to the language and intent of that rule.

GR 37(c) states, "A party may object to the use of a peremptory challenge to raise the issue of improper bias. . . . The objection shall be made by simple citation to this rule, and any further discussion shall be conducted outside the presence of the panel." After the party exercising the peremptory challenge "articulate[s] the reasons that the peremptory challenge has been exercised," GR 37(d), "[t]he court shall then evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances" and shall deny the challenge "[i]f the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." GR 37(e).

"This court interprets court rules the same way it interprets statutes, using the tools of statutory construction." *State v. Hawkins*, 181 Wn.2d 170, 183, 332 P.3d

408 (2014) (citing *State v. George*, 160 Wn.2d 727, 735, 158 P.3d 1169 (2007)); *see also In re Disciplinary Proc. Against King*, 168 Wn.2d 888, 899, 232 P.3d 1095 (2010) ("'We interpret a court rule as though it were enacted by the legislature, giving effect to its plain meaning as an expression of legislative intent.'" (quoting *State v. Chhom*, 162 Wn.2d 451, 458, 173 P.3d 234 (2007))). Our fundamental objective when interpreting a rule is to ascertain and carry out the drafting body's intent. *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 350, 340 P.3d 849 (2015); *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). We start with the plain language of the rule, looking at it "in context, considering related provisions, and in light of the statutory or rule-making scheme as a whole." *State v. Stump*, 185 Wn.2d 454, 460, 374 P.3d 89 (2016); *Ass'n of Wash. Spirits & Wine Distribs.*, 182 Wn.2d at 350 (citing *Campbell & Gwinn*, 146 Wn.2d at 9-10).

Hogan argues defense counsel's objection satisfies GR 37's requirements because he "raise[d] a GR 37 argument" and made "simple citation" to the rule, as the rule's plain language requires. Suppl. Br. of Pet'r at 35; *see also State v. Quismundo*, 164 Wn.2d 499, 505-06, 192 P.3d 342 (2008) ("A trial court's obligation to follow the law remains the same regardless of the arguments raised by the parties before it.").

The Court of Appeals rejected that argument. It cited GR 37(c)'s language—"A party may object to the use of a peremptory challenge *to raise the issue of improper bias*" (emphasis added)—and reasoned that the rule's plain language makes clear that "its sole target is improper bias *based on race or ethnicity*." *Hogan*, 33 Wn. App. 2d at 218. The Court of Appeals therefore concluded, based on the plain language of the rule, that Hogan's gender-based GR 37 objection failed to preserve a race-based GR 37 argument on appeal.

The rule's plain language and context could support both interpretations. Accordingly, we look to the rule's history and circumstances surrounding its enactment to determine the drafting body's intent. *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 354, 144 P.3d 276 (2006) (citing *Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004) (plurality opinion)); *Five Corners Fam. Farmers v. State*, 173 Wn.2d 296, 306, 268 P.3d 892 (2011).

As discussed above, we adopted GR 37 because the United States Supreme Court's decision in *Batson*[10] failed to protect against race discrimination in jury selection. *See, e.g.*, *Bell*, 5 Wn.3d at 63-64; *Pierce*, 195 Wn. 2d at 239; *Saintcalle*, 178 Wn.2d at 46-49. One of *Batson*'s major weaknesses was that it placed a high

---

[10] *Batson* required the objecting party to first state a prima facie case of discrimination. Then, the party using the strike must provide a race-neutral reason to justify the challenge. Finally, the court considers the totality of the circumstances to determine if purposeful discrimination motivated the challenge. *Batson*, 476 U.S. at 96.

burden on the party objecting to the peremptory challenge, requiring that party to show that the challenge was motivated by purposeful discrimination. By comparison, *Batson* made the burden on the party making the peremptory challenge exceedingly low; that party had to give only a cursory race-neutral reason to justify the challenge. GR 37 shifted that imbalance by placing a low burden on the objecting party and a high burden on the striking party to justify its peremptory challenge. *See Bell*, 5 Wn.3d at 94 (Mungia, J., concurring in result) ("Under the new rule . . . the bar for a GR 37 objection to be sustained was intentionally set low.").

The final report of the jury selection work group that this court formed to address *Batson*'s shortfalls makes this clear.[11] The report confirms that the group intended to recommend a low threshold for objection. FINAL REPORT at 4. In fact, the report reflects majority agreement that the basis for the objection need not be articulated: the group voted, 14 to 1, to eliminate from the rule's proposed language the sentence "The basis for the objection shall then be articulated." *Id.* at 11 n.6.

This history demonstrates that the rule's drafters did not intend to require the objecting party to give a full articulation of the racial or ethnic bias to which it

---

[11] PROPOSED NEW GR 37—JURY SELECTION WORKGROUP, FINAL REPORT (2018) (FINAL REPORT),
https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders
/OrderNo.25700-A-1221Workgroup.pdf. We have previously cited the *Final Report*, which recommended language for GR 37, when describing the history of GR 37. *See State v. Tesfasilasye*, 200 Wn.2d 345, 357, 518 P.3d 193 (2022); *State v. Jefferson*, 192 Wn.2d 225, 244, 429 P.3d 467 (2018) (plurality opinion).

objected. This court adopted the rule as written, with the benefit of the drafters' report. We therefore conclude that an objection based on GR 37 alone would have sufficed.

But Hogan did not stop at saying, "GR 37." He immediately continued that he was not objecting to race or ethnicity bias at all. Instead, he was objecting on a non-GR 37 basis, inviting the trial court to address only the non-GR 37 issue. This defense argument undermined its citation to GR 37 and defeats Hogan's current argument that his citation to GR 37 preserved a valid GR 37 claim of race-based discrimination for review.

### C. This Court Has, However, Ruled That We May Address Issues of Race Discrimination for the First Time on Appeal. We Do So Here

Nevertheless, this court has made clear that we may consider claims of racial bias for the first time on appeal in certain circumstances.

We have emphasized that racial bias in the justice system "so 'fundamentally undermines the principle of equal justice and is so repugnant to the concept of an impartial trial' that it requires a distinct set of standards." *State v. Zamora*, 199 Wn.2d 698, 709, 512 P.3d 512 (2022) (quoting *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011), and citing *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 225, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017)).

One of those "distinct . . . standards" is that claims of race-based prosecutorial misconduct may be reviewed for the first time on appeal: "Unlike the rules for

general prosecutorial misconduct, the rule for race-based prosecutorial misconduct does not differentiate between a defendant who objects and one who does not object." *Id.* at 709 n.11; *see also State v. Bagby*, 200 Wn.2d 777, 522 P.3d 982 (2023) (considering claim of race-based prosecutorial misconduct despite lack of objection); *Monday*, 171 Wn.2d at 679-80; *State v. Bellerouche*, 33 Wn. App. 2d 877, 901, 565 P.3d 604, *review denied*, 5 Wn.3d 1042 (2025); *State v. Darraji*, 34 Wn. App. 2d 410, 414, 568 P.3d 1143, *review denied*, 5 Wn.3d 1021 (2025); *State v. Ibarra-Erives*, 23 Wn. App. 2d 596, 605, 516 P.3d 1246 (2022); *In re Pers. Restraint of Skone*, 30 Wn. App. 2d 1, 31-34, 543 P.3d 842 (2024).

To be sure, GR 37 claims of racial bias in jury selection are not the same as the race-based prosecutorial misconduct claims addressed in the decisions cited immediately above. But they implicate similar rights, like the juror's right to sit and the defendant's constitutional right to a fair trial. So we have relaxed procedural rules to address these claims, also. *See In re Pers. Restraint of Rhone*, 1 Wn.3d 572, 528 P.3d 824 (2023) (addressing an otherwise procedurally barred claim of racial bias in jury selection by recalling the mandate of the first appeal); *see also Hawkins*, 200 Wn.2d at 501 (explaining that individualized evidence of racial bias is not required before a court can consider arguments on that subject for the first time on appeal).

Consistent with our case law highlighting the importance of preventing racial bias from infecting the jury process, we may consider this claim on appeal despite counsel's failure to object effectively at trial. *See, e.g.*, *Zamora*, 199 Wn.2d at 711-12 (noting that "what occurs during voir dire is equally as important as what occurs during trial proceedings"); *Bagby*, 200 Wn.2d 777. We choose to do so here to resolve some significant questions about how GR 37 works.[12]

III.    An Objective Observer Could Not View Race as a Factor in the State's Use of a Peremptory Challenge to Juror 40

That means that we must answer the question of could an objective observer view race as a factor in the State's use of a peremptory challenge against juror 40?

We begin by explaining the factors we consider in making this decision. We then consider those factors to answer the question presented.

*A. As Discussed Above, We Will Not Credit the Trial Court's Observations About Juror 40's Supposed Demeanor*

As noted above, the State justified its peremptory challenge to juror 40 with descriptions of their demeanor. In denying defendant's GR 37 objection, the court adopted the State's demeanor-based reasons:

[T]here is a basis for challenging them that is—that is not based on—on their identity and that is their answers on the questionnaire which indicated that they have strong beliefs about when police use excessive

---

[12] *E.g.*, *State v. Matamua*, 28 Wn. App. 2d 859, 875, 539 P.3d 28 (2023) (noting that the trial court mistakenly believed "that jurors of color were the only 'jurors to which GR 37 applies'" (emphasis omitted)).

use of force on arrestees, the protesters and historically [under]represented groups.

And also, they were very reticent when answering questions during voir dire. They—they seemed to have a very difficult time, uh, responding to questions. And so, um, the motion is denied and Juror 40 is struck.

6 VRP (June 1, 2022) at 926-27.

As discussed above, at pages 19-22, GR 37(i) places strict limits on the trial court's authority to consider such demeanor-based justifications. Neither the State nor the trial court complied with those GR 37(i) limits. We therefore decline to credit the State's demeanor-based justifications for striking juror 40.

> *B. Considering the Totality of the Circumstances—Except Juror 40's Supposed Demeanor—An Objective Observer Could Not View Race as a Factor in the State's Decision To Strike Juror 40. This Rebuts the Presumption of Invalidity and Resolves This Issue*

Hogan argues that the State's next justification for striking juror 40—their views on race bias in policing—is presumptively invalid under GR 37(h). A court is never justified in relying on a potential juror's race or ethnicity as a basis to remove them from the jury. While a juror's viewpoint may, in some circumstances, reveal possible racial bias in the use of a peremptory challenge, it did not do so here.

Hogan is correct that the State used juror 40's views on race and policing as a justification for its peremptory challenge. Juror 40 expressed "significant concerns about the criminal justice system." 6 VRP (June 1, 2022) at 926. And the trial court accepted that justification by describing the juror's "strong beliefs about when police

use excessive . . . force" as "a basis for challenging them that is . . . not based on . . . their identity." *Id*. at 926-27.

Hogan is also correct that GR 37(h)(ii) makes it "presumptively invalid" to strike a juror for "expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling."

GR 37(h) does so because that reason—like the other reasons listed in GR 37(h)—have historically been associated with improper dismissals of jurors of color. GR 37(h) ("Because historically the following reasons for peremptory challenges have been associated with improper discrimination in jury selection in Washington State, the following are presumptively invalid reasons for a peremptory challenge.").[13] Those GR 37(h) reasons have not been historically associated with improper dismissal of white jurors.

Nevertheless, under the plain language of the rule, juror 40's "significant concerns about the criminal justice system" expresses just such a distrust of law enforcement. Thus, the State's use of that justification is presumptively invalid.

---

[13] *Tesfasilasye*, 200 Wn.2d at 358 (citing FINAL REPORT, app. 2 (Statement of ACLU of Wash., Wash. Ass'n of Crim. Def. Laws., Fred T. Korematsu Ctr. for Law & Equality, Legal Voice, Loren Miller Bar Ass'n, and Latina/o Bar Ass'n of Wash.)); *see also* FINAL REPORT, app. 2 (citing TASK FORCE ON RACE & CRIM. JUST. SYS., PRELIMINARY REPORT ON RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM 7 (Mar. 2011); EQUAL JUST. INITIATIVE, ILLEGAL RACE DISCRIMINATION IN JURY SELECTION: A CONTINUING LEGACY 28 (Aug. 2010)).

But that presumption is subject to rebuttal. GR 37(e) instructs courts to "evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances." Thus, to answer GR 37's ultimate inquiry—whether an objective observer could view race as a factor in the use of the peremptory challenge—we must evaluate the reasons given to justify the peremptory challenge, including this presumptively invalid reason in light of the totality of the circumstances. We review the record as a whole to determine whether the pattern of questions and answers, by this potential juror and the other potential jurors, along with the State's proffered reasons for its challenge, suggests to an objective observer that race could have been a factor. GR 37(g); *see Tesfasilasye*, 200 Wn.2d at 357, (citing FINAL REPORT, app. 2). We will not credit the comments about juror 40's supposed demeanor. GR 37(i). Similarly, we will not credit a presumptively invalid reason for the peremptory challenge. GR 37(h).

As discussed above, the State defended its challenge to juror 40 by stating that juror 40 "was uncomfortable talking about their very significant political views in the group" and "did not seem like someone from the State's perspective that was going to be able to . . . in a jury room take a position and stand up for it and communicate with other jurors." 6 VRP (June 1, 2022) at 925-26.[14]

---

[14] We note the distinction between these reasons and the ones discussed earlier, i.e., that juror 40 "struggled to sort of articulate their thoughts" and "seemed very uncomfortable." 6 VRP (June 1, 2022) at 925-26. Those are conduct-based justifications

To be clear, the challenging party's stated subjective intent for its peremptory challenge is not determinative of whether that peremptory challenge violates GR 37. *Bell*, 5 Wn.3d at 69. But we do consider the challenging party's justifications because they bear on how to view the challenge "from an objective observer's position." *Id.* A lack of record support for the proffered reason could indicate to an objective observer that the reason is pretextual.

In this case, the record supports the State's assertions about juror 40. Juror 40 asked for individual questioning about their political views. Juror 40 had strong political views, and juror 40 expressly declined to discuss their views about firearms in front of the group. 5 VRP (May 31, 2022) at 764-65. Concerns about a potential juror's ability to participate in deliberations is a legitimate basis to bring a peremptory challenge. There are no red flags indicating that any of the State's reasons implicated the juror's race. Likewise, there is no indication that the State used peremptory challenges disproportionately against a given race or ethnicity or that its use of peremptory challenges had a discriminatory effect. *See* GR 37(g).

We conclude that the State's demeanor-based reasons for striking juror 40 cannot be credited because the State failed to follow GR 37(i)'s procedure. We

---

limited by GR 37(i). But the State's observation that juror 40 "was uncomfortable talking about their very significant political views in the group" relates to juror 40's willingness to speak in front of a group—not to their demeanor. *Id.* at 925. And that reason finds support in the record: Juror 40 requested individual questioning about their political views.

further conclude that the State did use a presumptively invalid reason for striking juror 40—their "significant concerns about law enforcement." But the totality of the circumstances rebuts the presumption of invalidity. Considering the full record of voir dire, it is apparent that some jurors who expressed views similar to juror 40's were seated and some were struck. The number and types of questions posed to juror 40 were similar to those posed to other jurors. And the State had legitimate reasons, grounded in the record, to strike juror 40. Thus, the totality of the circumstances confirms that an objective observer could not view race as a factor in State's use of the peremptory challenge.

IV.    RAP 10.8 Does Not Limit Statements of Additional Authorities to Authorities Published After the Briefs Are Filed

Hogan also challenges the Court of Appeals' refusal to consider his SAA. The Court of Appeals reasoned that "none of the authority Hogan offer[ed] was decided after the completion of the briefing" and that it "'d[id] not view [SAAs] as being intended to permit parties to submit to the court cases that they failed to timely identify when preparing their briefs.'" *Hogan*, 33 Wn. App. 2d at 223 n.7 (quoting *O'Neill v. City of Shoreline*, 183 Wn. App. 15, 23, 332 P.3d 1099 (2014)).

But the rule's plain language contains no such limitation. RAP 10.8 provides, in relevant part:

> (a) Generally. A party or amicus curiae may file a statement of additional authorities. The additional authorities must relate to a point made in the briefing or at oral argument.

(b) Contents. The statement must include argument explaining the reasons for the additional authorities and must include a pinpoint citation either to the pertinent page of the brief or to a point argued orally.

(Boldface omitted.)

The plain language of the rule does not limit a statement of additional authorities to new law. *Futurewise v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 164 Wn.2d 242, 248 n.2, 189 P.3d 161 (2008) ("Anacortes filed a motion to strike [an SAA], claiming . . . that it cites to legal authorities that are not new. We deny the motion . . . because nothing in [RAP 10.8] limits its application to newly created law."); *see also State v. Luna*, 5 Wn.3d 465, 514 n.18, 578 P.3d 273 (2025) ("Parties often file [SAAs] that bring to our attention relevant new opinions that have been published since our grant of review in a case, but nothing in the text of RAP 10.8 limits its application to that type of authority.").

CONCLUSION

We hold that a party who objects to a peremptory strike on the basis of GR 37 can preserve that objection for review by simply stating, "GR 37."

We also hold that defense counsel's objection citing "GR 37" but then inviting the trial court to address only gender identity bias, rather than race or ethnicity bias, undermined its citation to GR 37 and failed to preserve a GR 37 objection for review.

But we reaffirm our prior decisions holding that we may nevertheless choose to reach claims of race discrimination for the first time on appeal. We do so in this case.

With regard to the merits of the question presented, we hold that the State failed to follow GR 37(i)'s procedures for considering its demeanor-based justifications for its peremptory challenge. For that reason, its demeanor-based justifications cannot be considered.

We further hold that when a party justifies a peremptory challenge using a reason listed in GR 37(h), the presumptive answer to GR 37's ultimate question (whether an objective observer could view race as a factor in the use of a challenge) is yes. But that presumption can be overcome if the totality of the circumstances would lead an objective observer to conclude that the answer is no.

Considering the totality of the circumstances in this case, we hold that an objective observer could not view race as a factor in the use of a peremptory challenge against juror 40. Thus, the State did not violate GR 37.

We affirm the Court of Appeals.

Gordon McCloud, J.

WE CONCUR:

Montoya-Lewis, J.

Whitener, J.

González, J.

Yu, J.P.T.

No. 103824-1

MUNGIA, J. (concurring)—I agree with the majority that Nigel Hogan failed to properly preserve the GR 37 objection for review.  However, I disagree with the majority's decision to exercise its discretion to address this issue for the first time on appeal.

Mr. Hogan raised an objection under GR 37 during the jury empaneling process. The purpose of GR 37 is to eliminate the unfair exclusion of prospective jurors based on their race or ethnicity who are otherwise qualified to serve.

In this case, Mr. Hogan did not raise a GR 37 objection because of prospective juror 40's race or ethnicity but instead raised the objection based on his assumptions about prospective juror 40's gender identity.  Mr. Hogan did not argue that the State had used its peremptory challenge because of potential juror 40's race or ethnicity.  The trial court properly denied Mr. Hogan's objection.

Now, on appeal, Mr. Hogan argues that prospective juror 40's beliefs about race were among the reasons that the State used a peremptory challenge to exclude prospective juror 40 from serving on the jury.  Mr. Hogan did not raise this issue at the

trial court and, therefore, did not preserve the issue for appellate review. *State v.*

*Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). As the majority notes, when a party

fails to raise an argument to the trial court, it deprives the trial court of the opportunity to

address that issue. In addition, it deprives the opposing party of the opportunity to make

further inquiry at the trial court level. It may result in an insufficient record for an

appellate court to review the issue in an informed manner. Further, Mr. Hogan does not

adequately argue that this GR 37 issue is a manifest error affecting a constitutional right,

which would allow him to raise the issue for the first time on appeal.[1] RAP 2.5(a)(3).

Accordingly, I would hold that the only issue Mr. Hogan preserved for review is

whether a party may make a GR 37 objection based on their perception of a prospective

juror's gender identity. The answer to that question is no—the trial court properly denied

the GR 37 challenge. I would not address any other issue Mr. Hogan attempts to raise.

I respectfully concur.

---

[1] Mr. Hogan devotes one sentence of his supplemental brief to arguing that this court has "constitutionalized" GR 37 and, therefore, the issue is a manifest error affecting a constitutional right. Suppl. Br. of Pet'r at 38.

Mungia, J.

Stephens, C.J.

Johnson, J.

Madsen, J. PT.

3